**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALASKA RENT-A-CAR, INC.,
*Plaintiff-Appellee*,

v.

AVIS BUDGET GROUP, INC., FKA
Cendant Corporation; AVIS BUDGET
CAR RENTAL, LLC, FKA Cendant
Car Rental Group, Inc., FKA
Cendant Car Rental Group, LLC,
*Defendants-Appellants*.

No. 10-35137

D.C. No.
3:03-cv-00029-
TMB

---

ALASKA RENT-A-CAR, INC.,
*Plaintiff-Appellee*,

v.

AVIS BUDGET GROUP, INC., FKA
Cendant Corporation; AVIS BUDGET
CAR RENTAL, LLC, FKA Cendant
Car Rental Group, Inc., FKA
Cendant Car Rental Group, LLC,
*Defendants-Appellants*.

No. 10-35615

D.C. No.
3:03-cv-00029-
TMB

OPINION

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, District Judge, Presiding

Argued and Submitted
July 25, 2011—San Francisco, California

Filed March 6, 2013

Before: Andrew J. Kleinfeld, Johnnie B. Rawlinson,[*]
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Kleinfeld

**SUMMARY**[**]

**State Law /** *Daubert* **/** *Batson* **/ Attorneys' Fees**

The panel affirmed the district court's judgment,
following a partial summary judgment and a jury trial, in an
action alleging breach of a settlement agreement, and
remanded for the district court to reduce the prejudgment
interest award.

[*] The original panel, consisting of Judge B. Fletcher, Judge Kleinfeld,
and Judge Callahan, heard oral argument on July 25, 2011. Judge B.
Fletcher died on October 22, 2012, while the decision was pending, and
Judge Rawlinson was drawn to replace her. Judge Rawlinson has read the
briefs, reviewed the record, and listened to the tape of oral argument.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

The district court held that Alaska Rent-A-Car was a party to a settlement agreement, and that Avis had breached the agreement by using the same personnel to sell and market both Avis and Budget Rent-A-Car cars. The panel held that Alaska Rent-A-Car was a party to the settlement agreement by virtue of its sufficiently timely joinder. The panel also held that it was not error when during jury selection the district court applied *Batson v. Kentucky*, 476 U.S. 79 (1986), and rejected one of Avis's peremptory challenges to one of two Alaska Natives on the panel. Addressing Avis's objection under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the panel held that the district court did not abuse its discretion by allowing the jury to listen to Alaska Rent-A-Car's expert witness on damages as well as Avis's. The panel also held that under New York law, there was sufficient evidence to establish reasonable certainty for the amount of damages awarded by the jury to Alaska Rent-A-Car. The panel further held that the law of the forum, Alaska, properly applied to diversity cases brought in or removed to the United States District Court for the District of Alaska, and the district court did not err by applying Alaska Rule of Civil Procedure 82 to the attorneys' fee award.

---

### COUNSEL

Christopher Landau (argued), Stephen S. Schwartz, Kirkland & Ellis LLP, Washington, D.C.; Howard S. Trickey, Matthew Singer, Jermain, Dunnagan & Owens, P.C., Anchorage, Alaska, for Appellants.

Susan Orlansky, Jeffrey M. Feldman, Feldman Orlansky & Sanders, Anchorage, Alaska, for Appellee.

---

## OPINION

KLEINFELD, Senior Circuit Judge:

Several state law questions arise in this appeal, and three federal law questions, whether expert testimony should have been excluded under *Daubert*[1], whether disallowance of a peremptory challenge was *Batson*[2] error and if so whether it was harmless, and whether Alaska "English Rule" attorneys fee awards[3] may be awarded in a diversity action where Alaska is the forum state but another state's law governs the dispute.

## FACTS[4]

Alaska Rent-A-Car's predecessor began doing business as an Avis licensee in 1956, three years before Alaska attained statehood. Most other Avis licensees had a defined territory in a locality, not an entire state, within which they had the exclusive right to rent cars on behalf of Avis. Avis reasonably considered Alaska different.

In its 1959 agreement, the Alaska Avis licensee was entitled to operate in the "entire State of Alaska," about 20% of the entire United States, but a negligible percentage of the

---

[1] *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993).

[2] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[3] Alaska Civil Procedure Rule 82.

[4] "We recount the relevant facts in the manner most favorable to the jury's verdict." *United States v. Hicks*, 217 F.3d 1038, 1041 (9th Cir. 2000), *cert. denied*, 531 U.S. 1037 (2000).

nation's roads.  The license was renewed in 1965, this time giving Alaska Rent-A-Car exclusive rights in specific locations within Alaska.  A 1976 amendment added additional locations to the license agreement, and gave Alaska Rent-A-Car a right of first refusal for control of any license Avis planned to grant anywhere in Alaska.  It also gave Alaska Rent-A-Car the right to expand into new territory, such as temporary camps during the construction of the oil pipeline from Prudhoe Bay to Valdez during the 1974-1977 period. The 1976 amendment stated:

> It is additionally agreed: (a) That Alaska conditions of terrain and weather as well as changing and cyclical economic conditions may result in customer demands for quick service in new and even temporary locations or camps.  It is understood that Licensee may utilize his floating fleet to meet such demands, with full reporting of such circumstances to Avis.

Avis bought a company called Agency Rent-A-Car in 1995.  Some of Avis's licensees claimed that Avis was breaching their license agreements by operating another rental car company in their territories.  To protect itself against these claims, Avis sued thirteen of its licensees, and sought class certification, to obtain a judgment that its purchase of Agency Rent-A-Car and its changed operations did not violate licensee rights.  Avis and named defendants settled in 1997, without ever litigating to class certification or judgment.  Our case arises out of that settlement, which allows Avis to purchase additional rental car companies, but requires that "the sales, marketing and reservation activities, operations and personnel of and for the Avis System will not

be utilized to market, provide, and/or make available car rental services" for any additional rental car company purchased by Avis.[5]  The settlement agreement protected Avis licensees from the risk of Avis using its personnel to steer customers and potential customers towards another brand.  Licensees would typically only rent Avis cars, but Avis might own a competitor operating in the same locality under a different name.

Avis bought Budget Rent-A-Car out of bankruptcy in 2002.  It then restructured its central operations, putting the Avis and Budget marketing teams under unified management, creating a single team to answer calls to both Avis and Budget reservation lines, and combining the Avis and Budget national corporate sales forces.  The obvious threat from these actions to Avis's licensees was that Budget would bleed off some of their customers and potential customers.  People typically rent cars online or by telephone from a national site or 800 number, and governments and big corporations typically negotiate with the national entity, because they typically rent cars for use away from home.

Alaska Rent-A-Car sued Avis claiming that Avis had indeed breached the settlement agreement, causing Alaska business to be switched to Budget Rent-A-Car, its local competitor.  The district court granted a partial summary judgment, establishing that Alaska Rent-A-Car was a party to the settlement agreement, and that Avis had breached the

---

[5] The two appellants in this litigation are Avis Budget Car Rental, LLC and its parent company, then HFS Car Rental, later Cendant, now Avis Budget Group, Inc.  We refer to appellants collectively here as Avis, but note that the settlement agreement's restrictions on buying an additional car rental company were restrictions on the parent company.

agreement by using the same personnel to sell and market both Avis and Budget cars.  Damages were left for jury trial.  The jury returned a verdict in favor of Alaska Rent-A-Car for $16 million.  Avis appeals.

## ANALYSIS

### I.        Was Alaska Rent-A-Car a promisee under the settlement agreement?

The question whether the 1995 settlement agreement included Alaska Rent-A-Car was decided by partial summary judgment, so we review de novo.[6]  Avis argues on appeal that Alaska Rent-A-Car was not a party.

First, Avis argues that Alaska Rent-A-Car could not be embraced by the settlement agreement, because the agreement protected only licensees with "exclusive" license agreements, that is, with exclusive territories within which Avis could not promote competitors to the licensee except to the extent the settlement agreement allowed.  This argument is entirely without merit.  One reason why is that Alaska Rent-A-Car plainly did have exclusive territories, the designated and permitted locations within the State of Alaska.  Were Alaska Rent-A-Car to use the Avis brand to open a counter at the Seattle airport, it would violate its licensing agreement, just as any other Avis licensee would if it opened a counter at the Anchorage airport.  The other reason is that we can find no language limiting permission to join in the settlement agreement to licensees with exclusive licensing agreements.  The settlement agreement was offered to "all

[6] *See Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 776 (9th Cir. 2010).

Avis System licensees/franchisees," which Alaska Rent-A-Car indisputably was.

Avis also makes the more substantial argument that Alaska Rent-A-Car's joinder was untimely. What color this argument has arises from the fact that Alaska Rent-A-Car did not send in a signed joinder to the settlement agreement until July 2001, almost four years after the settlement and three and a half years after Avis had sent its licensees a letter inviting them to join in the settlement.

Avis's letter was an offer, and Alaska Rent-A-Car's response was an acceptance. The parties do not dispute that New York law controls on the timeliness of acceptance, and New York law establishes the usual rule, that acceptance must be within a "reasonable" time.[7] Under New York law, reasonableness is normally a question for a jury. However, a court may decide it as a matter of law when rational jurors could reach only one conclusion.[8]

Three or four years might well be unreasonable in many circumstances, but not in this one. First, the offer stated no time limit on acceptance, though Avis could easily have expressly limited the duration of its offer. The reasonable inference from Avis's failure to impose a time limit is that it did not intend for there to be a time limit, because it saw advantage to joinders whenever they came in. Second, four and a half years after Alaska Rent-A-Car joined, eight years

---

[7] *See, e.g.*, *Sterngass v. Maisel*, 519 N.Y.S.2d 569, 570 (N.Y. App. Div. 1987).

[8] *Cf. id.* at 570; *B/R Sales Co. v. Krantor Corp.*, 640 N.Y.S.2d 204, 205 (App. Div. 1996).

after the offer was made, Avis asked the court overseeing the Agency settlement to declare the offer terminated, implying that Alaska Rent-A-Car's joinder came in plenty of time. Third, Avis's intent that no time limit should apply may be inferred from its written confirmation of acceptances by six other licensees who sent in their acceptances after Alaska Rent-A-Car did. Fourth, Avis's previous representations in this litigation that Alaska Rent-A-Car had joined in the settlement imply that it too interpreted its own offer to be open to acceptance and timely accepted by Alaska Rent-A-Car. Avis has cited no New York case involving anything like parallel facts where an acceptance was deemed untimely, and a rational juror could only conclude from Avis's actions that Alaska Rent-A-Car's acceptance was made within a reasonable time. The district court was correct in ruling that Alaska Rent-A-Car was a party to the settlement agreement by virtue of its sufficiently timely joinder.

## II.    *Batson*.

During jury selection, Avis made peremptory challenges of the only two Alaska Natives on the panel.[9] The district court accepted one but denied the other, applying *Batson v. Kentucky*.[10] Avis argues that denial of its peremptory challenge of the second Alaska Native juror, who sat on the trial jury, was a *Batson* error requiring reversal. We reject the

---

[9] Ever since the many aboriginal peoples in Alaska, including Inupiat, Yupik, several groupings of Athabaskans, Haida, Tsimshian, Tlingit, Aleut, and many others united during the struggle for what became the Alaska Native Claims Settlement Act, their and others' custom has been to refer to "Alaska Natives" as a uniting term.

[10] *Batson v. Kentucky*, 476 U.S. 79 (1986).

argument on alternative grounds, that there was no error, and that even if there had been, it would be harmless.

Since liability was established by summary judgment, the only issue for the jury was whether Alaska Rent-A-Car had proved damages, and if so, how much. Avis had to start off on the wrong foot, that it had made a promise to Alaska Rent-A-Car and broken it. Faced with the problem of justifying a zero or low damages award despite having broken its promise, Avis needed a jury willing to deny an award to the victim of a broken promise. Avis's attorney used voir dire to try to avoid jurors who would punish the broken promise even if no damages were proved.

Avis asked prospective jurors whether any of them had "a strong belief or hold a strong opinion that if someone breaks a promise that they should be punished for that by having to pay damages?" The first of the two Native veniremen, Number 6, said she agreed that someone who breaks a promise should be punished by having to pay damages, even if there was no proof of any loss. But at a sidebar, Number 6 said she would nevertheless follow the judge's instructions if they were to the contrary. Avis exercised a peremptory challenge against her. Despite a *Batson* challenge from Alaska Rent-A-Car, the judge allowed Avis to use that peremptory challenge. The judge accepted Avis's lawyer's representation that he was not satisfied that her feelings, about how damages ought to be awarded for breach of contract regardless of whether actual loss was proved, would not affect her verdict. No issue has been raised in this appeal about allowing that challenge.

The issue goes to the challenge of the other Native venireman, Number 15. When informed that he was almost

out of time to question prospective jurors, Avis's counsel chose to question Number 15, who said that whether she would punish someone who broke a promise without harming anyone "would depend on how the promises were made and what's been broken."  Two non-minority jurors said substantially the same thing.  But both of the unchallenged jurors assured counsel they would obey the court's instructions regardless of their feelings.  Number 15 did not say she would obey the instructions despite her personal views, but because the court's time limit ran out, she was not asked.

Responding to Alaska Rent-A-Car's *Batson* challenge, Avis's lawyer said his gut feeling was that Number 15 viewed punishment as appropriate for breach of contract regardless of whether there was any harm.  He pointed out that there were no racial issues in this commercial dispute, and said his challenge was not based on race.  Alaska Rent-A-Car's lawyer and the judge both expressed their confidence that Avis's lawyer was not racially motivated (the trial was in Alaska, where the lawyers and judges often have substantial professional experience with, against, and before each other). But the judge disallowed the challenge.  The court acknowledged that Avis's lawyer had not had sufficient time for a dialogue on voir dire with Number 15, to see whether she would follow instructions about damages despite her views to the contrary, but the court was not satisfied with striking both Native jurors on the record before him.

This *Batson* issue is difficult because of the explicit finding that Avis's lawyer did not act with a racial motivation.  The court did not expressly find the evil to which

*Batson* is directed, "purposeful racial discrimination."[11]  The judge merely indicated that he was uncomfortable in this case with a jury from which all Natives had been excluded by peremptory challenges.

*Batson* applies to civil as well as criminal cases.[12]  Avis was entitled to its peremptory challenge unless it exercised it in a manner violative of *Batson*.  The troubling issue here is step three of the three-part *Batson* test (prima facie case, race-neutral explanation, finding of pretext).[13]  Were it not for the express agreement by the judge and counsel that Avis's lawyer, whom they likely all knew, was not personally motivated by ethnic discrimination, pretext would strongly suggest itself.  Venireman 15 said just what two unchallenged non-Native jurors said, so "comparative juror analysis"[14] would support an inference of "purposeful racial discrimination."  And when Avis's lawyer saw that time was running out, he chose to question Number 15 instead of another venireman.

We are nevertheless not persuaded that the district court erred.  We review application of *Batson* law to facts

---

[11] *United States v. Collins*, 551 F.3d 914, 919 (9th Cir. 2009) (quotations and citations omitted); *accord Batson*, 476 U.S. at 86, 98.

[12] *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614 (1991).

[13] *Batson*, 476 U.S. at 93–98; *Collins*, 551 F.3d at 919.

[14] *See Lewis v. Lewis*, 321 F.3d 824, 830–31 (9th Cir. 2003); *see also Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

deferentially[15] and note that part three of the *Batson* test "asks judges to engage in the awkward, sometimes hopeless, task of second-guessing a [lawyer's] instinctive judgment – the underlying basis for which may be invisible even to the [lawyer] exercising the challenge."[16]  It seems evident that although the district judge believed that Avis's lawyer had no subjective purpose of racial discrimination, he was concerned that an objective observer would infer from the facts – comparative analysis of the substantially similar responses from two unchallenged non-Native jurors, skipping over other veniremen to get to Number 15 – that there was purposeful discrimination.  Such a concern is among the reasons for *Batson*.  "The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude [minorities] from juries undermine public confidence in the fairness of our system of justice."[17]

Objective analysis is also more reliable than subjective analysis.  A judge, like any person, is ill-equipped to see into

---

[15] *Batson*, 476 U.S. at 98 n.21 ("[A] finding of intentional discrimination is a finding of fact entitled to appropriate deference by a reviewing court. Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.") (quotations and citations omitted); *United States v. Bauer*, 84 F.3d 1549, 1555 (9th Cir. 1996) (noting that a trial court's findings regarding purposeful discrimination are entitled to great deference).

[16] *Miller-El*, 545 U.S. at 267–68 (2005) (Breyer, J., concurring).

[17] *Batson*, 476 U.S. at 87.

peoples' hearts.[18]  Trial judges are generally very reluctant to call a lawyer a liar, by finding that the justification for a peremptory challenge is not credible.  But a trial judge is in a very good position to evaluate objectively and impartially what the record would establish, from the point of view of a reasonable observer.  In this case, the trial judge found the absence of subjective racial bias, but the presence of an appearance of purposeful discrimination.  That suffices to justify denial of a peremptory challenge, at least in a civil case.

Even if there were error, we held in *United States v. Lindsey*[19] that an erroneous denial of a peremptory challenge does not require automatic reversal.  We held that *Rivera v. Illinois*[20] overruled our holding in *United States v. Annigoni*[21] that denial of a peremptory challenge required reversal, and stated that "the *Rivera* Court directly undercuts our precedent by determining that the erroneous denial of a peremptory challenge may indeed be subject to harmless-error review."[22] We concluded that *Rivera* allowed us to "apply the standard of review that is appropriate under the circumstances of the district court's error."[23]  In *Lindsey*, we applied plain error

---

[18] *See, e.g.*, *United States v. Vance*, 62 F.3d 1152, 1158 (1995).

[19] *United States v. Lindsey*, 634 F.3d 541 (9th Cir. 2011), *cert. denied*, 131 S. Ct. 2475 (2011).

[20] *Rivera v. Illinois*, 556 U.S. 148 (2009).

[21] *United States v. Annigoni*, 96 F.3d 1132 (9th Cir. 1996) (en banc).

[22] *Lindsey*, 634 F.3d at 549.

[23] *Id.* at 550.

review, as Lindsey failed to object to the district court's error depriving him of a peremptory challenge.  Here, Avis did object.

The right to peremptory challenges in civil cases exists by virtue of Federal Rule of Civil Procedure 47(b) and 28 U.S.C. § 1870, three challenges per party or side, not by virtue of the Constitution.  Erroneous denial of a challenge is therefore subject to Federal Rule of Civil Procedure 61 on harmless error, requiring us to disregard error not affecting "substantial rights."

This case involved nothing bearing on race or ethnicity. Number 15 was not challenged for cause, and the feelings she expressed about damages were substantially identical to at least two other jurors' feelings.  The district court allowed Avis's attorney to use his third peremptory challenge on another juror if he wished, but counsel waived the opportunity, thereby allowing three people with the same uneasiness about breach without damages to stay on the jury instead of two.  The verdict was unanimous.  We are unable to see any way that "substantial rights," that is, rights affecting the substance of the case as opposed to the procedural right to three peremptory challenges, could have been affected by erroneous denial of this challenge.

## III.    *Daubert*.

Each side put on testimony of an expert witness on damages.  Avis objected under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*[24] and its progeny to allowing Alaska-Rent-A-Car's expert to testify.

---

[24] *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).

Before it allowed Alaska Rent-A-Car's expert to testify about his opinion on damages, the court gave Avis the opportunity to conduct a lengthy voir dire to inquire into the facts and data underlying the expert's conclusions. After that voir dire, the court made a *Daubert* gateway determination. It concluded that "there's enough underlying data and . . . a sufficient causal connection to allow [the expert's] testimony. . . . I think he's qualified to give the testimony. I think his testimony will assist the trier of fact and I think his opinion is the result of reliable principles and methods. . . . [C]learly, [Avis has] areas for cross examination, and that's what it's going to be subject to."

The task, for both sides, was to figure out how much business and how much profit Alaska Rent-A-Car had lost on account of Avis's breach of the settlement agreement. Avis had breached when it bought Budget Rent-A-Car out of bankruptcy in 2002 and then merged much of the two companies' national sales and marketing staffs into one.

As in any damages case, the calculation had to address a hypothetical world that never existed, one in which other things remained the same but the breach had not occurred. To calculate damages from the breach, as opposed to damages from competition, Alaska Rent-A-Car's expert witness compared Avis's and Budget's experience with Alamo-National's (Alamo) experience after Cerberus bought Alamo out of bankruptcy at around the same time. His theory was that Alamo and Budget both got infusions of capital and management enabling them to compete, but differed in that Cerberus did not rent cars through any other company, and Avis did, through Budget. Thus Alamo could not benefit from merging sales and marketing activities because Cerberus had no other car rental company, but Budget could. His

assumption was that Budget would have performed much like Alamo but for the benefit of a unified Avis-Budget sales and marketing effort.

Budget rebounded much faster than Alamo. The witness in effect treated the faster rebound of Budget as attributable to the breach of the settlement agreement. He used Alamo's national rate of rebound as a rough approximation of how Budget, had it not had the benefit of the breach, would have performed in Alaska. He then projected how much market share Budget gained each year due to the breach. He testified that he used Alamo's national rate of rebound as an approximation for how Budget in Alaska would have performed. He reasoned that the rental car market is a national market, and that national rebound rates would not be skewed by idiosyncratic local factors.

According to Alaska Rent-A-Car's witness, Alamo's national market share dropped 35% after it went into bankruptcy, slowly recovering after Cerberus bought it. Budget was in bankruptcy a shorter time, and recovered faster after Avis bought it. The witness, saying that he wanted to be conservative in his estimates, assumed that Budget would have lost 32.5% of its market share (slightly less than Alamo) had Avis bought it out of bankruptcy but not breached the settlement agreement.

Because the revitalized Budget would draw customers from other car rental companies too, not just Avis, the witness picked the Juneau airport to approximate how much of the bite would come out of Alaska Rent-A-Car. Juneau had the advantage of simplicity, because he could examine a market before Budget entered and after Budget entered, to approximate how much business it took from Alaska-Rent-A-

Car.  Over the first three years of its entry into the Juneau market, Budget got an average of 23.3% of the Juneau rental car market.  About 48% of that market share gain came from Alaska Rent-A-Car customers, 52% from Hertz and other competitors.  So to get a statewide figure, the witness made the assumption that after the breach, Budget got about half its customers from Alaska Rent-A-Car statewide.  He calculated Budget's market share after the bankruptcy, assumed that but for the breach Budget's rate of market share recovery would have been similar to Alamo's national rate of recovery, and assumed that about half of its faster recovery came at the expense of Alaska Rent-A-Car.  These assumptions and inferences generated lost profits calculations of $4.079 million from 2003 to 2008 due to the breach, and future lost profits, discounted to present value, of $11.708 million.

Avis challenges the expert's assumptions and comparisons.  It argues that differences between Alamo and Budget, such as the much longer duration of Alamo's bankruptcy, and many other factors, made Alamo an invalid comparison.  Avis also argues that applying a national market share comparison to Alaska overlooked very significant differences in how the national and Alaska markets worked. And it argues that Alaska Rent-A-Car's extrapolation from the Juneau market experience ignored the differences between this small market, only 5% of the statewide rental car market, and the market elsewhere in the state, where roads connected towns (unlike Juneau), and doing business more often required a rental car.  Of course, Alaska Rent-A-Car's expert gave reasons for his use of all these comparisons, such as by pointing out the clarity with which the Juneau market could be examined.  Because Budget entered Juneau in 2000, Juneau could clearly show how much business Budget took from Avis there.

All of Avis's challenges to Alaska Rent-A-Car's expert are colorable, but none go to admissibility. They amount to impeachment. Under Federal Rule of Evidence 702 the trial court may exercise discretion to allow expert testimony if the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue;" (1) it is "based upon sufficient facts or data;" (2) it is "the product of reliable principles and methods;" and (3) the expert "has applied the principles and methods reliably to the facts of the case."[25] This list of requirements makes the task of determining admissibility sound more mechanical and less judgmental than it really is. Under *Daubert v. Merrell Dow Pharmaceuticals*[26] and its progeny,

> [T]he court must assess [an expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion. In sum, the trial court must assure that the expert testimony "both rests on a reliable foundation and is relevant to the task at hand."[27]

---

[25] Fed. R. Ev. 702 (2009). Stylistic changes were made to Rule 702 in 2011, after this case had gone to trial. The changes were not substantive. We use the language as it was when this case was decided.

[26] *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).

[27] *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quoting *Daubert*, 509 U.S. at 597) (footnotes and citations omitted).

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."[28]

The *Daubert* reliability requirement "is flexible" and "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case."[29] "The 'list of factors was meant to be helpful, not definitive' and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on 'the particular circumstances of the particular case.'"[30]

Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury. Avis does not challenge Alaska Rent-A-Car's expert's credentials and qualifications. Nor does it challenge his general methodology, comparing the unknown to an analogous known experience. Instead, Avis challenges three aspects of the witnesses testimony: using Alamo as the comparator, using the national rather than the Alaska market as a baseline, and extrapolating from the Juneau market to the

---

[28] *Id.* at 565 (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

[29] *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

[30] *Primiano*, 598 F.3d at 564 (quoting *Kumho Tire*, 526 U.S. at 151, 150).

entire Alaska market.  None of these challenges make the district judge's decision to admit the testimony an abuse of discretion.  They all go to the weight of the testimony and its credibility, not its admissibility.  Avis gave the jury good arguments for rejecting the testimony, but the district court did not abuse its discretion by allowing the jury to listen to Alaska Rent-A-Car's expert as well as Avis's.  "Given that the judge is 'a gatekeeper, not a fact finder,' the gate could not be closed to this relevant opinion offered with sufficient foundation by one qualified to give it."[31]

## IV.     Certainty of damages.

The jury returned a unanimous $16 million verdict for Alaska Rent-A-Car, slightly more than the $15,787,182 in damages that Alaska Rent-A-Car's expert witness calculated.  Avis's expert witness offered no total number at all to the jury, just critiques of the other expert's assumptions and calculations, with some numbers differing from his for component parts.  Avis thus presented the case to the jury as a $16 million or nothing choice.  Avis argued in its close that the burden of proof on damages was on Alaska Rent-A-Car, and that its expert was effectively impeached by theirs, so no damages should be awarded.

The district court found, and neither side disputes, that New York law controls on the standard of certainty required for damages for breach of contract.  Avis moved unsuccessfully for judgment as a matter of law that damages had not been proved with sufficient certainty or for a new trial. We review denial of a motion for judgment as a matter of law de novo, but draw all inferences in favor of the

---

[31] *Id.* at 568 (quoting *Sandoval-Mendoza*, 472 F.3d at 654).

verdict.**32** "The test is whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury."**33** We review a ruling on a motion for new trial for abuse of discretion, and reverse "only if the record contains no evidence in support of the verdict or if the district court made a mistake of law."**34**

Under New York law, in order to recover lost profits Alaska Rent-A-Car must prove that "(1) the damages were caused by the breach; (2) the alleged loss must be capable of proof with reasonable certainty, and (3) the particular damages were within the contemplation of the parties to the contract at the time it was made."**35** "Damages resulting from the loss of future profits are often an approximation. The law does not require that they be determined with mathematical precision. It requires only that damages be capable of measurement based upon reliable factors without undue

---

**32** *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1005 (9th Cir. 2004).

**33** *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002) (quotation omitted).

**34** *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 962 (9th Cir. 2009) (quotation omitted).

**35** *Ashland Mgmt. Inc. v. Janien*, 604 N.Y.S.2d 912, 916 (N.Y. 1993).

speculation."[36]    Avis's argument is a continuation of its *Daubert* attack on Alaska Rent-A-Car's expert's testimony.

New York courts generally reject lost profits for (1) new business ventures as being based on impermissible speculation, such as profits from a contemplated stadium that was never built[37] and (2) established businesses projecting

---

[36] *Id.* at 915; *see also* 36 N.Y. Jur. 2d Damages § 107 ("The plaintiff must supply some basis of computation for ascertaining the loss with certainty. . . . The plaintiff must offer some reasonable basis for ascertaining the amount of profit lost; an allowance therefor cannot be made on the basis of guesswork or conjecture.  Absolute certainty of data upon which loss of future profits are to be estimated is not required, but some fairly definite basis for computation must be supplied. . . . No hard and fast rule in this regard can be laid down because such losses are determined according to the circumstances of each particular case. But lost profits cannot be proved where a multitude of assumptions underlying the plaintiff's claim makes it impossible to satisfy the 'reasonable certainty' test, even if the business were considered to be an existing business").

[37] *See, e.g.*, *Kenford Co. v. County of Erie*, 502 N.Y.S.2d 131, 133 (N.Y. 1986) (claim for lost profits for stadium too speculative because the stadium had not been built yet, and lost profits calculation assumed successful operation of the stadium, attracting sporting events, meetings, conferences, and other forms of entertainment over a 20 year span); *Blinds to Go (U.S.), Inc. v. Times Plaza Development, L.P.*,  88 A.D.3d 838, 841 (N.Y. App. Div. 2011) (reversing an award of lost profits because, "[i]n light of the tenant's admission that it leased the subject premises to break into a new market, and its own expert's testimony demonstrating the differences between the subject premises and the allegedly comparable stores, the evidence on lost profits was so lacking that the verdict could not have been reached on any fair interpretation of the evidence."). We note, however, that "[T]here is no per se rule precluding a new business from recovering lost profits."    *Cifone v. City of Poughkeepsie*, 650 N.Y.S.2d 797, 798 (N.Y. App. Div. 1996) ("A claim based on the loss of anticipated profits in connection with a thwarted business venture may be proved by methods other than by reference to the actual past profit-making 'experience' of the enterprise in question, provided that the

future profits without a past history of profits, such as one that in its five years of existence had never made a profit.[38] Alaska Rent-A-Car was neither.  It had been operating a successful business since before statehood.  And New York courts have upheld the award of lost profits, where, as here, past performance combined with some indicia of likelihood of future success were presented to the jury.[39]  This case is analogous to *Greasy Spoon*, where the plaintiff was already

---

future profits can be calculated with reasonable certainty.") (quotation and citation omitted).

[38] *See, e.g.*, *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 932 (10th Cir. 2004) (applying New York law and rejecting lost profits as too speculative because "[e]ven assuming that LifeWise could show lost profits damages despite never having been profitable, it has not done so here in a manner that satisfies New York's prohibition of speculative damages.  In its damages report, LifeWise has failed to connect its past losses with its proposed future earnings.  It remains a fact that LifeWise sustained losses in every year of its over five years of existence, and frequently experienced capitalization problems, yet the damages model predicted only uninterrupted future growth.").

[39] *See, e.g.*, *Greasy Spoon, Inc. v. Jefferson Towers, Inc.*, 552 N.Y.S.2d 92, 94 (N.Y. 1990) ("Plaintiff established at trial that it was already operating a successful restaurant business at a commercially desirable site.  Further, plaintiff's witnesses gave evidence, based upon experience, as to the level of profits that could reasonably be anticipated . . . . Unlike in *Kenford*, where lost profits from a municipality's decision not to construct a stadium were denied in part because there were too many undetermined variables, in this case most of the variables that would affect the success of the thwarted business venture, i.e., location, capitalization and existing or potential clientele, were established through competent proof.  Thus, the evidence at trial was sufficient to remove plaintiff's lost profit claim from the realm of impermissible speculation."); *cf. Wathne Imports, Ltd. v. PRL USA, Inc.*, 953 N.Y.S.2d 7 (N.Y. App. Div. 2012).

operating a successful restaurant (despite the name) and the projection of lost profits was from adding a sidewalk café.[40]

A jury might have been persuaded by the impeachment testimony, rejected Alaska Rent-a-Car's expert's damages analysis and calculation, and awarded nothing. But it was not, and the jury was entitled to decide.  Drawing all inferences in the favor of the non-moving party, as we must, the evidence – including but not limited to the expert testimony – sufficed to establish reasonable certainty for the damages awarded.

## V.      Attorney's Fees

Alaska has, since Congress applied the general laws of Oregon to the Territory of Alaska in 1884, followed the English Rule rather than the American Rule on attorney's fees.[41]   Alaska is the only state that follows the English Rule,[42] that the prevailing party is generally entitled to an attorney's fees award, though many federal and state statutes

---

[40] *Greasy Spoon*, 552 N.Y.S.2d at 94.

[41] Susanne Di Pietro & Teresa W. Carns, Alaska's English Rule: Attorney's Fee Shifting in Civil Cases, 13 Alaska L. Rev. 33, 38–39 (1996) (citing Frederic E. Brown, The Sources of the Alaska and Oregon Codes Part II: The Codes and Alaska, 1867–1902, 2 UCLA-Alaska L. Rev. 87, 88 (1973)).

[42] *Edwards v. Alaska Pulp Corp.*, 920 P.2d 751, 755 (Alaska 1996); Benjamin J. Roesch, Erie Similarities: Alaska Civil Rule 68, "Direct Collisions," and the Problem of Non-Aligning Background Assumptions, 23 Alaska L. Rev. 81, 81 (2006).

provide for awards in designated circumstances.[43]   Though sometimes criticized,[44] the rule remains robustly in force.

Present Alaska practice is set out in Alaska Rule of Civil Procedure 82, which generally requires the award of attorney's fees to the prevailing party in civil cases.[45]   The Alaska Supreme Court has promulgated Rule 82 pursuant to its constitutional authority to "make and promulgate rules governing practice and procedure in civil and criminal cases in all courts."[46]

The United States District Court for the District of Alaska has itself for many years treated Alaska Rule 82 as generally applicable in civil proceedings where federal law did not provide otherwise.[47]   The district court followed its usual practice in this case, awarding $1,605,000 in attorney's fees

---

[43] *See, e.g.*, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 261–62 (1975).

[44] *See e.g.*, Andrew J. Kleinfeld, Alaska: Where the Loser Pays the Winner's Fees, 24 Judges' J. 4 (1985).

[45] Alaska Civil Procedure Rule 82(a) ("Except as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule.").

[46] Alaska Const. art. IV, § 15; *see also State v. Native Village of Nunapitchuk*, 156 P.3d 389, 395 (Alaska 2007).

[47] Although District of Alaska Local Rule 54.3(b) no longer provides expressly, as it did until 2006, that "In a diversity case the court will apply Rule 82, Alaska Rules of Civil Procedure," it appears to assume that such fees will still be awarded, since it provides that motions for attorney's fees must "set forth the authority for the award, whether Rule 82, Alaska Rules of Civil Procedure" or some other source.

based upon the Rule 82 formula.  As the district court held in *Ryan v. Sea Air*, "Alaska follows the English Rule, by virtue of which the prevailing party always recovers a portion of its fees from the losing party," and the United States District Court treats this Alaska practice as "binding in diversity cases" brought there.[48]  *Ryan* cites our 1979 decision in *Klopfenstein v. Pargeter*, in which we upheld an Alaska Rule 82 attorney's fees award in a diversity case, because "[i]n a diversity action the question of attorneys fees is governed by state law."[49]

Two issues arise in this case.  First, should federal law or state law apply to an attorney's fees award?  Second, if state law applies, should Alaska law or New York law control?

The first question is easily answered.  As both parties agree, state law applies.  The Supreme Court held in *Alyeska Pipeline Service Co. v. Wilderness Society*[50] that for *Erie Railroad Co. v. Tompkins*[51] purposes, state law on attorney's fees is substantive, so state law applies in diversity cases. "[I]n an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial

---

[48] *Ryan ex rel. Syndicates and Ins. Companies Subscribing to Policy PHP91-4699 v. Sea Air Inc.*, 902 F. Supp. 1064, 1070 (D. Alaska, 1995).

[49] *Klopfenstein v. Pargeter*, 597 F.2d 150, 152 (9th Cir. 1979).

[50] 421 U.S. 240 (1975).

[51] 304 U.S. 64 (1938).

policy of the state, should be followed."[52]  We have of course said the same thing.[53]

The second question, Alaska law or New York law, is more intricate.  The rule is that the federal court in which the case is litigated should apply the forum state's choice of law rules.[54]  The parties agree that Alaska choice of law rules apply.

Though federal law establishes that attorney's fees law is substantive for *Erie* purposes, it is not necessarily substantive for choice of law purposes.[55]  Whether it is substantive or procedural for choice of law purposes depends on how the Supreme Court of the forum state would characterize it.  Some state Supreme Courts consider their rules governing

---

[52] *Alyeska Pipeline*, 421 U.S. at 259 n.31 (quoting 6 J. Moore, Federal Practice 54.77(2), pp. 1712-1713 (2d ed. 1974)).

[53] *See, e.g.*, *MRO Communications, Inc. v. American Tel. & Tel. Co.*, 197 F.3d 1276, 1282 (9th Cir. 1999) ("In an action involving state law claims, we apply the law of the forum state to determine whether a party is entitled to attorneys' fees, unless it conflicts with a valid federal statute or procedural rule.").

[54] *See, e.g.*, *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496 (1941) ("The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts. . . .  Any other ruling would do violence to the principle of uniformity within a state upon which the *Tompkins* decision is based.").

[55] *See, e.g.*, *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 108–10 (1945); *Sun Oil Co. v. Wortman*, 486 U.S. 717, 726 (1988) ("*Guaranty Trust* itself rejects the notion that there is an equivalence between what is substantive under the *Erie* doctrine and what is substantive for purposes of conflict of laws.").

attorneys fees to be procedural for choice of law purposes.[56] If the Alaska Supreme Court would consider its attorney's fees rule procedural, then Alaska law, the English Rule, would apply.  If, however, the Alaska Supreme Court would consider its attorney's fees rule substantive, then New York law, the American rule, would apply.

And that too is intricate.  The Alaska Supreme Court has never held that Alaska Rule of Civil Procedure 82 is procedural for Alaska choice-of-law purposes.  However, it has stated in dicta in *Ehredt v. DeHavilland* that "attorney's fee are not an item of damage," and that it would thus apply Rule 82 even if another state's substantive law applied.[57]  We must follow the considered dicta, as well as the holdings, of the Alaska Supreme Court when applying Alaska law.[58]  The Alaska Supreme Court has also held, in *State v. Native*

---

[56] *See, e.g.*, *Kirwan v. Chicago Title Ins. Co.*, 624 N.W.2d 644, 653 (Neb. 2001) (applying a Nebraska statue on attorney's fees in insurance actions, despite the fact that South Dakota law governed the underlying dispute, because Nebraska deems its attorney's fees statute to be procedural); *North Bergen Rex Transport, Inc. v. Trailer Leasing Co.*, 730 A.2d 843, 848 (N.J. 1999) (applying New Jersey law on attorney's fees despite the fact that another state's substantive law governed the underlying dispute, because "attorneys' fees are a matter of practice and procedure, rather than of substantive law.").

[57] *Ehredt v. DeHavilland Aircraft Co. of Canada, Ltd.*, 705 P.2d 446, 452 n.8 (Alaska 1985) ("Thus, even if we applied Florida law, Civil Rule 82 would control an award of attorney's fees.").

[58] *See Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1164 (9th Cir. 1995) ("The district court, like us, is bound to follow the considered dicta as well as the holdings of the California Supreme Court when applying California law.").

*Village of Nunapitchuk*,[59] that Rule 82 is procedural, not substantive, though not in the choice of law context.[60] *Nunaptichuk* dealt with whether Rule 82 is procedural for purposes of the Alaska Constitution, which "commits the enactment of all substantive law – that is all law *except* rules of practice and procedure – to the legislature" but authorizes the Supreme Court to "promulgate 'rules governing practice and procedure in civil and criminal cases in all courts.'"[61]

In analyzing *Nunapitchuk*, we note that Alaska generally follows the Restatement (Second) of Conflict of Laws,[62] which says that "[a] court usually applies its own local law rules prescribing how litigation shall be conducted even when it applies the local law rules of another state to resolve other issues in the case."[63] Avis urges us to hold that Rule 82 is not a rule "prescribing how litigation shall be conducted" because the Alaska Supreme Court has said that Rule 82 has a partially compensatory purpose. We reject this argument because *Nunapitchuk* deemed Rule 82 to be "primarily concerned with . . . an effective and efficient system for the administration of justice" despite its compensatory purpose.[64]

---

[59] 156 P.3d 389 (Alaska 2007).

[60] *Id.* at 395, 402.

[61] *Id.* at 395–96 (quoting Alaska Const. art. IV, § 15) (emphasis in original).

[62] *See, e.g.*, *Savage Arms, Inc. v. Western Auto Supply Co.*, 18 P.3d 49, 53 (Alaska 2001) ("We look to the Restatement (Second) of Conflict of Laws for guidance in resolving choice-of-law issues.").

[63] Restatement (Second) Conflict of Laws § 122.

[64] *Nunapitchuk*, 156 P.3d at 398.

Based on the dicta in *Ehredt* and the holding and analysis in *Nunapitchuk*, we conclude that the Alaska Supreme Court would hold, for purposes of choice of law, that its attorney's fees rule is procedural.  Rule 82 is thus substantive for *Erie* purposes, procedural for Alaska constitutional purposes of allocating authority as between the courts and the legislature, and procedural for choice of law purposes.  We therefore hold that the law of the forum, Alaska, properly applies to diversity cases brought in or removed to the United States District Court for the District of Alaska.  The district court did not err by applying Alaska Rule of Civil Procedure 82 to the attorney's fee award.

## VI.     Prejudgment Interest.

The district court awarded prejudgment interest pursuant to New York law of 9% per annum.[65]  The court used Alaska Rent-A-Car's expert's analysis to separate lost profits before judgment, 2003 to 2008, from lost profits projected to occur after the 2009 judgment.  The court then applied the New York interest rate to the profits lost before the verdict on a year by year basis (approximately 6 years interest on 2003 profits, 5 years interest on 2004 profits, and so forth).  The total interest awarded was $1,478,519.23.  The court awarded an additional $57,739.51 as interest on lost profits from the date of the verdict to the date of judgment, plus $86,480.17 in interest on the entire judgment from the date of the verdict through the date of judgment. The parties agree that the $57,739.51 was an error, double counting, and that the judgment should be reduced by that amount.

---

[65] N.Y. C.P.L.R. § 5004.

Avis argues that the district court erred in one additional respect, making its own judgment on how to separate past from future lost profits, because the jury was not asked to do so by special verdict.  The argument is unpersuasive.

New York law[66] provides for the court to make just such a calculation as the district court made.  By statute, prejudgment interest "shall" be awarded for breach of contract.[67]  The statute provides that where damages "were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."[68]  The statutory language does not require juries to determine these various dates or the "single reasonable intermediate date." Instead, "[i]f a jury is discharged without specifying the date, the court upon motion shall fix the date."[69]  The New York practice appears to be for the trial court to make a reasonable calculation based on the evidence, as provided in the statutory language, directing the court to choose a "reasonable intermediate date" or to "upon motion . . . fix the date" implies.

Avis argues that two New York decisions establish that prejudgment interest cannot be awarded on a verdict that includes both past and future damages.  These cases, *Helman*

---

[66] The parties do not dispute that New York law applies to this issue.

[67] N.Y. C.P.L.R. § 5001(a).

[68] N.Y. C.P.L.R. § 5001(b).

[69] N.Y. C.P.L.R. § 5001(c).

*v. Markoff*[70] and *Brandt Corporation v. Warren Automatic Controls Corporation*,[71] should be distinguished.  In *Brandt*, the plaintiff recovered a general verdict on two theories, one of which was reversed on appeal, so there was no reasonable way to tell whether much or all of the damages were on the invalid theory.  In *Helman*, plaintiff recovered a general verdict on two causes of action, only one of which would allow an award of prejudgment interest.  By contrast, in this case, no theory of recovery on which the damages award was based is reversed, and the theory of recovery, breach of contract, is one for which New York requires a prejudgment interest award.

The district court had a reasonable basis in the record for allocating portions of the judgment to different years and calculating interest as it did.  Alaska Rent-A-Car's expert provided precisely such a breakdown, with a year by year table that the court used.  The jury's verdict was so close to the expert witness's calculation that the court could reasonably infer that the jury accepted the substantial correctness of his testimony, especially since Avis's expert witness provided no alternative calculation.   Avis's alternative, no prejudgment interest, assumes that "the jury may have awarded *no* damages at all subject to prejudgment interest,"[72] an assumption unsupportable on the record.

---

[70] *Helman v. Markoff*, 8 N.Y.S.2d 448 (App. Div. 1938), *aff'd per curiam*, 20 N.E.2d 1012 (N.Y. 1939).

[71] *Brandt Corp. v. Warren Auto. Controls Corp.*, 322 N.Y.S.2d 291 (App. Div. 1971).

[72] Avis Reply Brief at 13 (emphasis in original).

Denial of prejudgment interest would be contrary to the New York statute providing that it "shall" be awarded for breach of contract.  Since the breach and damage began about six years before the verdict, some sort of calculation of prejudgment interest was required by New York law.  Though Avis essentially faults Alaska Rent-A-Car for not obtaining a special verdict to facilitate the calculation, Avis also did not request a special verdict separating out past and future damages.  Avis gambled on an all or nothing argument, the jury awarded all, and Avis had not asked for an instruction requiring the jury to break out the pre and post-verdict amount.  It cannot now fault the court for making a reasonable allocation based upon evidence in the record that provided good support for the calculation it made.

## CONCLUSION

The judgment is **AFFIRMED**, except that we remand for the district court to reduce the prejudgment interest award by $57,739.51.  Costs are awarded to Alaska Rent-A-Car.